# EXHIBIT B

```
              IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE DISTRICT OF DELAWARE


IN RE:                       )    Case No. 08-13141(KJC)
                             )
                             )
TRIBUNE COMPANY              )    Chapter 11
                             )
                             )    Courtroom 5
                             )    824 Market Street
         Debtors.            )    Wilmington, Delaware
                             )
                             )    March 22, 2011
                             )    10:00 a.m.


                     TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE JUDGE KEVIN J. CAREY
                    UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtors:              Sidley Austin, LLP
                          BY: JAMES CONLAN, ESQ.
                          BY: KEN KANSA, ESQ.
                          BY: JESSICA BOELTER, ESQ.
                          One South Dearborn
                          Chicago, IL 60603
                          (312) 853-7000

                          Cole, Schotz, Meisel, Forman
                          & Leonard, P.A.
                          BY: NORMAN PERNICK, ESQ.
                          500 Delaware Ave., Ste. 1410
                          Wilmington, DE 19801
                          (302) 652-3131

ECRO:                     AL LUGANO

Transcription Service:    DIAZ DATA SERVICES
                          331 Schuylkill Street
                          Harrisburg, Pennsylvania 17110
                          (717) 233-6664
                          www.diazdata.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service
```

```
APPEARANCES:
(Continued)

For Morgan Stanley:        Barnes & Thornburg
                           BY: DAVID POWLAN, ESQ.
                           11 South Meridian Street
                           Indianapolis, IN  46204
                           (317) 727-2211
For Angelo Gordan/Oaktree/
Credit Agreement Lenders:  Young Conaway Stargatt &
                           Taylor
                           BY: BLAKE CLEARY, ESQ.
                           BY: ROBERT BRADY, ESQ.
                           The Brandywine Building
                           1000 West Street, 17th Floor
                           Wilmington, DE 19801
                           (302) 571-6600

For Merrill Lynch:         Potter Anderson & Carroon, LLP
                           BY: LAURIE SILVERSTEIN, ESQ.
                           Hercules Plaza
                           1313 North Market Street
                           6th Floor
                           Wilmington, DE  19801
                           (302) 984-6033

For Barclays:              DLA Piper
                           BY: MICHELLE MARINO, ESQ.
                           1251 Avenue of the Americas
                           New York, NY  10020-1104
                           (212) 335-4500

For JP Morgan:             Davis Polk & Wardwell
                           BY: ELLIOT MOSKOWITZ, ESQ
                           BY: DAMIEN SCHAIBLE, ESQ.
                           450 Lexington Avenue
                           New York, NY 10017
                           (212) 450-4000

                           Richards Layton & Finger
                           BY: BOB STEARN, ESQ.
                           One Rodney Square
                           920 North King Street
                           Wilmington, DE  19801
                           (302) 651-7700
```

45

```
 1  R. McCormick Foundation appearing pro hac vice, thank you
 2  very much, Your Honor.
 3              And just to be clear, although many creditors
 4  file joinders to our objection, I'm here and speaking only
 5  on  behalf of the foundations.  We don't object that had
 6  there been no claim brought to avoid these transfers by the
 7  estate, then the state law constructive law claims would
 8  have flown back to the individual creditors.  We think that
 9  because -- I think the point that Your Honor just raised
10  albeit not in the manner I'd hoped you raise it, that these
11  very transfers are being sought to be avoided by these
12  estates and precludes individual creditors from seeking to
13  avoid them, even under a slightly different theory or even a
14  different theory.  It's the same dollars, the same
15  transfers, you know, consider it a single satisfaction issue
16  if you have to.  To the extent they go forward, they're
17  necessarily reducing the value of the claims the estate is
18  bringing because we cannot be made to pay them both.
19              So with that, I really did not mean to interrupt.
20  I only rose so that you know that there is an issue to that
21  extent.
22              THE COURT:  So it's your position basically that
23  the estate would have first call on any proceeds?
24              MR. SIEGER:  I think that's right, Your Honor.  I
25  think the case law supports that.
```

46

```
 1              THE COURT:  Okay, thank you.
 2              MR. GOLDEN:  Your Honor, what I was going to say
 3  that I'm not aware of any party disputing the specific
 4  question you raised which is when a state representative
 5  fails to bring a timely avoidance action is there any real
 6  dispute that it reverts or individual creditors retain their
 7  state law rights, I didn't hear counsel suggesting that he
 8  is actually disputing that.  He made the slightly subtle
 9  argument that says when the estate is bringing another cause
10  of action, a similar cause of action, it should deprive the
11  individual state law creditors from having standing to
12  pursue their claim and they've cited some case law for that
13  effect or to that effect.
14              Your Honor, that doesn't go to the issue of
15  whether these claims exist and are they viable and are they
16  entitled to be brought by the individual state law
17  creditors.  That's a standing issue which I'm going to get
18  to.  The standing issue is certainly not an issue for this
19  Court to decide.
20              THE COURT:  I don't disagree with that, but let's
21  -- as much as I don't like to do this sometimes, but I think
22  it may be appropriate here, let's look down the road a
23  little bit.  The objection here is that well, look, we're
24  only going to be required to pay this one time.  So the
25  question that that raises is how should this Court, if at
```

47

```
 1  all, address the potential conflict between those two sets
 2  of plaintiffs.
 3              MR. GOLDEN:  Okay.  Two points I'd like to make
 4  with respect to that, Your Honor.
 5              Number one, again, under the heading of
 6  bankruptcy indeed makes strange bedfellows, despite the fact
 7  that there has been tremendous contentiousness over the two
 8  competing plans, there is a similarity between the two
 9  competing plans and that is the establishment of a
10  creditor's trust in order to house these individual state
11  law constructive fraudulent conveyance claims.  The
12  architects of both of those claims, the debtors, the
13  creditors' committee, and the lenders on one hand, and the
14  noteholders on the other, have made an informed decision as
15  other bankruptcy plans have done to allow those claims to
16  run in parallel and to prosecute them in parallel.
17              What the foundations I'll suggest not
18  intentionally have suggested is because the creditors'
19  committee have, in fact, filed intentional, estate
20  intentional fraudulent conveyance claims against the
21  redeeming stockholders, that that should take precedence.
22  But one problem we have with that is and I think Your Honor
23  knows as having sat through two weeks of testimony is it is
24  the intention of DCL plan proponents to release the
25  intentional fraud claims asserted by the creditors'
```

48

```
 1  committee against the Step 1 holders.
 2              So what the foundations want is their cake and
 3  eat it, too.  They want to have the DCL plan go forward.
 4  They want to have the claims, the intentional fraudulent
 5  conveyance claims released against the Step 1 holders, but
 6  they want to run out the clock so that the individual state
 7  law constructive fraudulent conveyance creditors don't have
 8  the ability by the state law statute of limitations which as
 9  we say in our paper, could be as early as June 4, less than
10  two and a half months away.  They won't have an effective
11  remedy at that --
12              THE COURT:  Well, let's assume that's true.  The
13  bridge lenders in their proposed form of order suggest that
14  what ought to happen is that you should be permitted to file
15  complaints, but not prosecute them until after the
16  confirmation process is complete.  Is that something that
17  you've agreed with or inclined to agree with or disagree
18  with?
19              MR. GOLDEN:  In fact, Your Honor, we said in our
20  opening brief, our opening motion, that it was the intention
21  of what we called the original plaintiff group, Aurelius,
22  the two senior indenture trustees, Wilmington Trust as
23  indenture trustee for the PHONES notes was to, in fact,
24  commence those lawsuits in order to toll the statute of
25  limitations and that we would voluntarily agree to stay
```

49

1  those actions pending the completion of the competing plan
2  process.
3         We are not looking to create chaos here.  What we
4  are trying to do is to ensure that at the end of the day in
5  a very uncertain plan process, that these state law
6  constructive fraudulent conveyance claims will survive.  Now
7  they may be dealt with one way or another depending upon
8  whether the DCL plan is confirmed, or the noteholder plan is
9  confirmed, or a third version of a plan is confirmed.  But
10 most important is the filing of those complaints so that we
11 can toll the statute of limitations.  So unless Your Honor
12 has any other questions, I'll just continue on, thank you.
13        As I said, we believe it is well settled that
14 once the estate representatives fail to bring the action
15 within two years, it reverts or the individual state law
16 creditors would gain those rights.  It's also we believe
17 clear law that once an estate representative can no longer
18 bring those claims, it has no right to settle those claims.
19 As I said, neither the debtors or the creditors' committee
20 opposes relief and is, in fact, as noted by Your Honor, the
21 creditors' committee affirmatively supports the relief in
22 order to be protective and to acquit their fiduciary, their
23 perceived fiduciary obligations to the general unsecured
24 creditors here.
25        THE COURT:  It could be the nicest thing Aurelius

50

1  has ever said about you.
2  (Laughter)
3         UNIDENTIFIED SPEAKER:  I made a note of it.
4         MR. GOLDEN:  So I just want to make sure that the
5  Court fully appreciates the intense time pressure we are
6  working under.  You know better than anybody in this
7  courtroom where we stand on the competing plan process.  It
8  is not clear that we will have an answer by June 4.  As we
9  indicated in our pleadings, there are several likely
10 jurisdictions in which the state law claims would be
11 brought; Illinois, Delaware, Massachusetts.  All of them
12 have four year statute of limitations for claims such as
13 these.  That four year statute of limitation as it relates
14 to Step 1 expires on June 4.  And as I said, the most
15 important thing for us to do is to get those things filed.
16        Your Honor, I want to turn just for a minute to
17 the objections themselves and we've touched upon it a little
18 bit.  The McCormick Foundation and I'm going to mispronounce
19 this, the Cantigny, but I'll just call them the foundation
20 so I don't continue to muffle that name, have opposed the
21 relief.  And they have been joined in that opposition by
22 seven or eight other recipients of the shareholder
23 redemption payments.  A group of three former directors and
24 officers of the debtor, a group of seventeen current and
25 former directors, officers, and employees, a fellow named

51

1  Crane Kenny who doesn't bother to identify himself, the ever
2  present EGI- TRB and Sam Zell, Bank of America and Merrill
3  Lynch, two of the four agents and arrangers for the
4  disastrous LBO loans, Chandler Bigelow, the current Chief
5  Financial Officer, and an untimely joinder filed by 200 so
6  called TM retirees which includes William Niese, a member of
7  the official creditors' committee.  All of those parties
8  have in common one thing.  Maybe they have more than one
9  thing, but one thing they certainly have in common, they
10 have received shareholder redemption payments that they want
11 to avoid having to disgorge back to either the estate or to
12 the individual state law creditors.
13        It's worth nothing, I think that the foundations
14 raise two principal arguments, one we've discussed already
15 which is a standing argument.  And they cite a number of
16 cases that suggest when the estate is bringing a similar
17 cause of action, that the -- it deprives the individual
18 creditors from standing to bring a separate action.  And
19 we've addressed those cases in our reply and we actually
20 think the case that's most factually analogous to the
21 situation we have here is the *Baron Financial Corp, 501
22 F.Supp.2d, F01, District Court of Maryland.*  There in that
23 case, there was an agreement between the estate and a
24 plaintiff seeking to bring similar causes of action that the
25 estate had brought or was able to bring.  That's very

52

1  analogous to the situation that we have here.
2         As I have just described to the Court, both the
3  DCL plan and the noteholder plan contemplates this very
4  arrangement.  Having the individual state law fraudulent --
5  constructive fraudulent conveyance claims housed in a
6  creditors' trust to be prosecuted on behalf of the
7  individual creditors at the same time the intentional
8  fraudulent conveyance claims are being pursued by the estate
9  under either the DCL plan or the noteholder plan.
10        Since the foundations are so concerned about the
11 issue of standing which as I'll get to a second, I think
12 really has no place here.  It is not for this Court to
13 adjudicate the standing issue if and when these claims are
14 actually brought to Trial Court under doctrines of ripeness
15 will be the correct court in our view to determine the issue
16 of standing.  But since they've raised the issue of
17 standing, I fail to understand what the standing is of the
18 foundations who as far as I know are not creditors of these
19 debtors.  Are no longer shareholders of these debtors.
20        So I don't -- I'm not sure I understand how they
21 have the right to be heard here in this court to complain
22 about this rather procedural motion that Aurelius has filed
23 along with the other noteholder proponents seeking very
24 limited relief.  A, that the filing of such lawsuits would
25 not violate the automatic stay.  And B, would not violate

53

1 Your Honor's mediation order.
2 Second point and I'll be brief, Your Honor. The
3 foundations raise the 546(e) issue as to whether these type
4 -- whether that statute prohibits state law constructive
5 fraudulent conveyance claims. They cite a lot of cases.
6 They don't cite a single case that stands for the
7 proposition when someone other than an estate representative
8 which is required under 546(e) to be applicable when someone
9 other than an estate representative brings an action, an
10 avoidance action to recover shareholder payments, there is
11 no bar as far as we know and --
12 THE COURT: Well, the argument if I can put it in
13 my own words is that what you want is -- constitutes an end
14 run around 546(e) and that doesn't seem right to them.
15 MR. GOLDEN: I understood the argument as well,
16 Your Honor. That --
17 (Laughter)
18 MR. GOLDEN: -- actually there is a case in the
19 District of Delaware. I think it's *PHP Liquidating* that
20 does, in fact, address that issue and stands for the
21 proposition when it's not an estate representative bringing
22 that action, 546(e) loses its applicability.
23 So just to sum up, Your Honor, I think this is
24 rather mundane procedural relief we're seeking. It's an --
25 I don't mean to minimize it, it's important to get these

54

1 lawsuits filed by June 4. We don't believe that the
2 foundations have standing to oppose this relief. And
3 frankly, even if you were to go through the issue of
4 standing which I think is a mistake as it would violative of
5 the Doctrine of Ripeness, the case law that they have
6 suggested, I don't believe supports their position. Thank
7 you, Your Honor.
8 THE COURT: Thank you. Let me hear first from
9 those who are in support of the motion and then I'll hear
10 from those who are opposed.
11 MR. LEMAY: Your Honor, excuse me, good morning.
12 David LeMay from Chadbourne & Parke for the official
13 committee of unsecured creditors. As a preliminary matter,
14 I would not want Your Honor to become irrationally exuberant
15 about the fact that I rise in support of Aurelius' motion or
16 about the configuration of the courtroom this morning. But
17 it is the case that we do support this motion and for the
18 reasons that Mr. Golden said which is that as a fiduciary
19 matter, it certainly seems that the motion that they've
20 filed is best calculated to maximize unsecured creditor
21 recoveries.
22 Mr. Golden has really very adequately and more
23 than adequately as he always does, summed up the argument.
24 And I think Your Honor is obviously very well seized of it.
25 The relief here is procedural and it is -- it's really very

55

1 limited in the ways that he described, relief from an order
2 entered by this Court and from the automatic stay. The
3 bondholders have filed that because as Mr. Golden mentions,
4 there's a June 4 clock ticking.
5 I think Mr. Golden said that there is intense
6 time pressure. I suppose I would observe that although June
7 4 is not an eternity away, it's not tomorrow either. And
8 the time pressure is as I suppose not quite as intense as
9 when we dealt with some of the issues prior to the December
10 two year statute of limitations. So there is I would say a
11 little bit more time, but here we are on the motion.
12 With respect to the objections, I think it's
13 pretty clear that the cases really do in the way that Your
14 Honor, I think prefigured, all fit together. It's not like
15 there are two separate sets of cases that go in different
16 directions. You've got the *Ruppert* case from the Fourth
17 Circuit and its progeny and that's the famous first swing
18 case. The Fourth Circuit said that the purpose there was to
19 assure that when the estate and individual creditors might
20 otherwise be in effect scrumming for the same causes of
21 action, the estate gets first swing. And here -- and so
22 what that imposes is the notion that while the estate
23 fiduciary is ready and able to pursue a claim, it does get
24 that first right. But once those claims pass out of the
25 estate's hands and here they have for the reasons that Mr.

56

1 Golden summarized, that I think that first swing doctrine is
2 satisfied, the first swing has in effect been had.
3 And if you want to continue with a baseball
4 metaphor, I guess what that means is the estate
5 intentionally took the pitch. At that point, I think the
6 *Baron* case is the one that tells you what happened. And the
7 *Baron* case says that there once the estate's first swing has
8 been had or passed, it does revert to individual creditors.
9 I think it would be a fairly serious torturing of
10 *Ruppert* and would require a serious -- fairly serious
11 torturing of R*uppert* to suggest that the dicta in that case
12 about the objects and purposes of the two claims being the
13 same meaning that they must travel together. I don't really
14 think that's what *Ruppert* was getting at. *Ruppert* as I
15 mentioned was really about prioritizing of what happens when
16 the estate wants to assert the same claims.
17 Here, instead, what's being said by the
18 foundations and I think Your Honor expressed some skepticism
19 about it, quite correct skepticism is that I guess the
20 argument that's being made is that the assertion of
21 intentional fraudulent transfer claims in Federal Court in
22 effect precludes the creditors from pursuing constructive
23 fraudulent transfer claims in State Court. And I just don't
24 think that can be the case. And even if it were the case,
25 as we point out in our papers, the two claims really are not

57

1   the same.  There are different pleading elements, different
2   burdens of proof, different recoveries, and of course, most
3   notably different defenses.
4          So even if that *Ruppert* doctrine or I'm sorry
5   that *Ruppert* dicta about objects and purposes being closely
6   correlated were to apply, these are different lawsuits about
7   different things.  And for those reasons, I don't think
8   *Ruppert* would be decisive even if the objects and purposes
9   test there were applicable which I don't think it is or I'm
10  sorry, it's objects and intents is the actual terminology.
11         As to the 546(e) defense which, again, I don't --
12  I do agree with Mr. Golden is not properly before the Court
13  today.  Just a couple of things.  It's really an attempt to
14  pre-litigate a motion to dismiss.  It's an attempt to get a
15  first crack at a motion to dismiss and then presumably have
16  a second crack in State Court later.  That issue, I think as
17  Mr. Golden says would need to be litigated in the Court
18  where the litigation was brought.  Everything Mr. Golden
19  says and that we mentioned in our papers about the *PHP* case
20  is true.
21         And the final thought I thought I would leave
22  Your Honor with on -- that is it's very interesting when
23  people -- people's metaphors sometimes say a fair amount of
24  what they're really thinking.  And the metaphor that's been
25  used here is the metaphor of an end run, another sports

58

1   analogy.  And an interesting thing about the end run is that
2   although it can sometimes surprise people, it's a perfectly
3   legal play.  And I don't want to put too much weight on
4   metaphor, but I think it does tell us something about this
5   posture here.
6          The committee supports the relief set forth in
7   the proposed order that was submitted by Aurelius.  I
8   believe that they will hand up to you, if it becomes
9   appropriate, a revised form of that order reflecting certain
10  comments we had and the committee would support the entry of
11  that revised order.  And I'm available to answer any
12  questions that the Court has.
13         THE COURT:  All right, thank you, Mr. LeMay.
14  Anyone else in favor of?
15         MR. SIEGEL:  Good morning, Your Honor.  Martin
16  Siegel from Brown Rudnick on behalf of Wilmington Trust.
17         Wilmington Trust, the indenture trustee for the
18  PHONES has joined in the motion and we adopt the arguments
19  of counsel for Aurelius and counsel for the creditors'
20  committee, but there is a couple of things I do want to
21  mention.
22         First of all, the claims in the trust at least in
23  the first instance on behalf of the PHONES pursuant to
24  Section 5.05 belong to the indenture trustee to bring.  The
25  indenture trustee here does intend to bring them.  And

59

1   because of our place in the capital structure, the PHONES
2   place in the capital structure, this is particularly
3   important relief, Your Honor, and may well be a very
4   important source of recovery for the PHONES.
5          In particular, I think the debtor actually agrees
6   with us.  With regard to the creditors' trust, one of our
7   objections to the debtors' plan was that the creditors'
8   trust that the -- that's part of that, we made the argument
9   that those contractual subordination provisions do not apply
10  to the creditors' trust for at least any PHONES holders that
11  did not opt out.  And the debtor agreed with us in Page 140
12  of their confirmation brief and said they're going to be
13  amending their plan to reflect that.  We think the same
14  principle will apply to any -- the state law claims brought
15  by Aurelius, the other indenture trustees, and Wilmington
16  Trust.
17         So from our standpoint, Your Honor, in
18  particular, we strongly urge that you grant the motion,
19  thank you.
20         THE COURT:  Thank you.  I'll hear from objectors.
21         MR. SIEGER:  Good morning, again, Your Honor.
22  John Sieger for the foundations appearing pro hac vice.
23         Your Honor, I want to pick up first on a point
24  that the committee raised in terms of the timing of this and
25  it actually goes --

60

1          THE COURT:  Well let's -- why don't we talk about
2   your standing first?
3          MR. SIEGER:  A couple of points on that, Judge.
4          THE COURT:  And typically, an entity that's not a
5   creditor of the estate or not otherwise a shareholder or
6   other party and interest wouldn't have standing to complain
7   about being a defendant in an adversary or a potential
8   defendant in the lawsuit.  And why would that be different
9   here?
10         MR. SIEGER:  Well, I've got at least three
11  responses to that, Judge, and maybe a fourth.
12         The first being, I'm not aware that anybody ever
13  raised the standing issue ahead of now and I would suggest
14  that it's been waived.  But to the extent that standing is
15  always an issue in front of the Court, we did argue in
16  connection with our confirmation objection that we are a
17  party and interest, albeit not a creditor.  There's no
18  dispute.  We are not a creditor of this estate.  We do
19  believe that we need to test -- it's fully briefed there.
20  Because it was not raised in the papers today, I'm not ready
21  to cite the cases we cited there, but I think -- I don't
22  believe anybody challenged it when we filed the confirmation
23  objection, frankly.
24         Next, Your Honor, I would submit that --
25         THE COURT:  The parties have been focused on

61

1  other things I think.
2          MR. SIEGER:  I heard there was something going on
3  in this room.
4  (Laughter)
5          MR. SIEGER:  Your Honor, in addition to that, I
6  would suggest that there's half a dozen lawyers in this room
7  that represent creditors that joined the motion.  I think
8  the issue is before the Court whether or not it is I
9  personally that was speaking to you.  The issue is properly
10 before the Court on behalf of creditors.
11         THE COURT:  Yeah, I didn't think I was going to
12 avoid a decision based on that.
13 (Laughter)
14         MR. SIEGER:  Your Honor, I'm happy to go further
15 with that, but in the event that Your Honor wanted to enter
16 an order today that said that we have no standing here today
17 and that nothing that's happening in this order is going to
18 impact us in any way in the impending State Court cases, I
19 think I'm stuck, I would sit down.  I wouldn't be happy
20 about that, but I would have to sit down.
21         They're going further, Judge.  They're asking you
22 to make a couple of findings that I believe, although they
23 say in their motion that it's a routine motion and that
24 everything is preserved.  They're asking you to find number
25 one, that these claims are not property of the estate.  And

62

1  they're asking you, number two, to say that these claims are
2  reverted to them.  I have seen a couple of versions of the
3  order, not the one that was just referenced by committee
4  counsel.  But so far as I know, that language is survived in
5  all of the drafts of the order.
6          I think if one were to be intellectually
7  consistent with the statements that this is just a routine
8  precautionary sort of motion, what Your Honor is really
9  being asked to enter is sort of an agreed stay relief
10 motion.  That in the event these state law claims are
11 brought, the creditors' committee, the debtor, maybe the
12 U.S. Trustee is not going to allege that they violated the
13 automatic stay.
14         THE COURT:  Yeah, if it applies.
15         MR. SIEGER:  That's correct.  If, in fact, Judge,
16 that was the limit of the relief sought here today, I'd have
17 a lot less to argue about.
18         THE COURT:  What about the provision in the
19 mediation order from which relief is sought?
20         MR. SIEGER:  I don't have a position on that,
21 Judge.  If they need -- I'm not familiar with it, but if
22 they need a relief from that in order to do it, that's not
23 my concern.  But as to the timing issue, Your Honor, I --
24 can -- are you happy with that issue?
25         THE COURT:  You don't have to sit down.

63

1  (Laughter)
2          MR. SIEGER:  On the issue that the committee
3  raised in terms of the timing, there is a lot of overlap
4  here between the issue that we raised in our objection and
5  the issues that we and other creditor -- that we, a non-
6  creditor and other creditors raised in connection with
7  confirmation.  And I agree with the committee's sort of
8  implication that this may not be a today issue.  We're not
9  trying to -- we don't expect to run out the clock, Judge.  I
10 mean, we're talking about as to my clients $1.2 billion.
11 We're not expecting the army of lawyers that represent the
12 estate or the largest creditors to somehow let that slip
13 through the cracks or for Your Honor to allow that to
14 happen.  But I would suggest that what happens at
15 confirmation could impact us.
16         There's an allegation that was raised today that,
17 you know, we're going to get a release as to Step 1.  And
18 while aware that that is proposed in one of the plans, I,
19 unfortunately, have not heard Your Honor sign off on that.
20 So I think it is premature to base any argument on that.  I
21 would -- and only Your Honor knows what the timing is of the
22 confirmation hearing, but I would suggest that if there was
23 a ruling even in late May, they could pick up and file
24 whatever claims they need to file in order to make a June 4
25 deadline.  I really would only ask that this matter be

64

1  pushed over until the argument on the confirmation
2  objections which covers not only this issue, but some
3  related issues.
4          But to the extent Your Honor wants to go forward
5  today on this issue, I do have legal argument to address
6  what the Aurelius counsel suggested.
7          THE COURT:  Then proceed.
8          MR. SIEGER:  Okay.  Your Honor, it is accurate to
9  say that we raised two main objections.  And I know you've
10 read the paper so I'll just highlight them briefly.  Number
11 one is the standing issue.  And number two is sort of the
12 preemption 546(e) issue.
13         Your Honor, what we have not heard from anybody
14 here despite the fact that this is being presented to you as
15 a routine motion, nothing out of the ordinary is a single
16 citation to any case where any creditor outside of
17 Bankruptcy Court, sued to avoid the very same transfers that
18 the estate has sued to avid.  The fact that they're calling
19 them constructive fraud claims as opposed to actual fraud
20 claims, we are talking about the same as to my client's $1.2
21 billion.
22         We have cited a case law that suggests that if
23 it's in the same ballpark roughly, they're precluded from
24 doing that.  And I don't know, there really is no effort to
25 overcome that.  They suggest that the cases are different,

65

1  but not based on relevant points.  Nobody says here's a case
2  where this has happened and where it's appropriate.  So at
3  an absolute minimum, this is unusual relief.  I might
4  suggest this is an issue of first impression before Your
5  Honor.  It's certainly not a routine motion.
6         Again, Your Honor, in terms of the ripeness, if,
7  in fact, they were not asking you to make findings that
8  number one these claims were property -- were not property
9  of the estate, and number two, that they've somehow reverted
10 to the creditors, I -- the ripeness argument would have more
11 appeal to me.  But what they want is an order to go waive in
12 front of a State Court Judge essentially with your
13 imprimatur on it suggesting you have a claim, Mr. Creditor.
14         THE COURT:  I know that.
15         MR. SIEGER:  Okay.
16 (Laughter)
17         MR. SIEGER:  I'll move on.  Your Honor, I would
18 go further to say that even if there was some question even
19 following that comment about ripeness, you have a lot of
20 discretion here.  And the mere fact that they are seeking to
21 file claims to recover the same dollars that the estate is
22 puts it squarely before Your Honor. You're the Bankruptcy
23 Judge for this estate and they're essentially talking about
24 depleting the value of the estate claims that have already
25 been raised.

66

1          I would submit that if the creditors' committee,
2  the debtor, and Aurelius were really all arm in arm about
3  this, the easy fix would be for the committee complaint to
4  dismiss the actual fraudulent transfer claims against the
5  foundation.  That way, they're not both going after the same
6  dollars.  If, in fact, they're right, it's a lower standard
7  of proof for them.  I mean, that -- the reason that there's
8  no case law on this, Your Honor, as part of your original
9  opening remarks, I believe is that it makes no sense to
10 allow somebody to go run off in the State Court and to try
11 to challenge the very same transfers, the very same dollars
12 that are supposedly going to be administered through a
13 bankruptcy plan for the benefit of all of the creditors.
14         Judge, I hear that one of the ideas is that, you
15 know, maybe we punt this issue down the road and they go
16 file a bunch of lawsuits of various jurisdiction and then
17 everything gets stayed.  In many ways, that's the worst of
18 all situations to the foundations, Judge.  We are a
19 charitable foundation, but the lion's share, I don't know
20 the exact numbers, but certainly the bulk of the
21 foundation's assets are put at issue by the filing of these
22 complaints.
23         And again, while we do believe in the single
24 satisfaction, we have -- we would have a very different view
25 just based on the legal standards of our exposure to an

67

1  actual fraudulent transfer claim than we would to four or
2  five different constructive fraudulent transfer claims where
3  not only is the standard different, but you've got four,
4  five, six judges looking at it differently.
5          In a way, we would be sort of frozen as a
6  foundation.  Our charitable works could be frozen in time
7  because all of our assets now are potentially at play.  I
8  don't think it would be good results here from that
9  perspective if you just want to look at it on an equitable
10 basis, to force the foundation to essentially freeze it's
11 good works at least at this, what I believe is a premature
12 point in time prior to the confirmation issues being
13 resolved.
14         Now Judge, sort of the next point they raise is
15 they spent a lot of time trying to distinguish our case law,
16 but the point that they distinguish almost every case on is
17 this notion that in the cases we cite, there was only a
18 potential estate cause of action having to do with the same
19 issues that the creditors were going after.  And they say
20 that none exist here because the two year statute ran and,
21 therefore, they reverted back.  They sort of have already
22 presumed the reverting back issue.  It belies -- it ignores
23 our point which is that they have not reverted back
24 principally because the estate has brought these claims.  So
25 they think that that fact is affecting their favor.  I think

68

1  that fact is affecting my favor because it's not even a
2  potential claim, it's an actual claim that's already been
3  brought to avoid these dollars.  So at a minimum, that is
4  not a point of distinguishment in the favor of the movants
5  in my view.
6          Your Honor, the next big point they raise is the
7  *Baron* case and I suggest that if Your Honor, your clerk
8  reads that case closely, you're not going to find that it's
9  particularly helpful to the movants' position.  First of
10 all, again, it doesn't avoid these -- sort of this idea of
11 competing suits to avoid the same transfers which in our
12 view is the issue that's in front of Your Honor.
13         And secondly, that Court, the *Baron* Court held
14 that plaintiffs' claims were direct sort of unique
15 individual claims, never common general claims which
16 obviously we're talking about here fraudulent transfer
17 claims.
18         And finally, those parties, Judge, at least as
19 written up in the case, the estate parties and the creditor
20 parties worked together to make sure that there wasn't
21 overlap between the claims.  There's obviously overlap here.
22         THE COURT:  Well, the movants says both plans are
23 designed to address that issue.
24         MR. SIEGER:  That may be, Judge, but we've
25 objected to both plans on exactly this ground.  This was

                                                                 69                                                                                 70

 1  part of the reason why I think this should be heard at a        1  at odds with the *Hechinger* case and the other cases which
 2  later time.  I think it's great that they're all holding        2  suggest that plain language is not the end of the analysis.
 3  hands and say this is a wonderful thing, but that doesn't       3          If, in fact, the plan language is at the end of
 4  address any of our objections which have not been ruled on      4  the analysis which this Court holds, the end arounds as
 5  so far as I know and --                                         5  we've been referring to them that other Courts have found
 6          THE COURT:  Not so far as I know either.                6  inappropriate, would not be precluded by the language in the
 7          MR. SIEGER:  Okay.  Well you would know, Judge.         7  statute.  I mean, it's the same sort of concept.  I might go
 8  (Laughter)                                                      8  so far as to say that that view is dicta, the holding at *PHP*
 9          MR. SIEGER:  But getting back to the *Baron* case.      9  because the Court went on to find that the creditors had no
10  There's I think a helpful quote in there that distinguishes    10  standing in that case to bring the claims.  But I'm not
11  exactly how different that case is from this case and that's   11  going to overstate that position, Judge.  That case is the
12  at *509F.Supp 520* where the Court says "plaintiff is not      12  one case that stands for one of the propositions they are
13  trying to recover assets diverted from the debtor." That is    13  suggesting.  We believe it's distinguishable for the reasons
14  exactly what is happening here.  The plaintiff creditors,     14  I've just said, but I'm going to give credit where credit is
15  the state law creditors are trying to recapture stock         15  due.
16  redemption payments made by the estates or the pre-           16          With that exception, Judge, with the exception of
17  bankruptcy companies to us.  So in my view, *Baron* is not    17  that case which only addresses one piece of this, we haven't
18  helpful.                                                       18  seen any evidence.  Any -- I'm sorry, any case law or
19          Your Honor, they raised the same ripeness issues      19  authority to support their position.  Nobody's disputing the
20  to 546 for the reasons I've already argued on in my first     20  fact that had the estate not brought these claims, the state
21  point.  I think the same apply there.  As to the merits, I    21  law fraudulent conveyance claims would have reverted back,
22  do have to agree that the *PHP* case has facial appeal and may 22  but that is not the issue here.  We spent a lot of time
23  even have more than facial appeal.  It's the one case they   23  talking about that.  Nobody cares about that.  There is no
24  cite, frankly, that gives me pause.  But again, I suggest     24  support for the idea that a creditor can independently
25  that if Your Honor reads that closely, the ruling itself is   25  challenge in State Court the very same transfers, even under

                                                                 71                                                                                 72

 1  a different theory, the very same dollar transfers that the    1  not being property of the estate.  What we're talking about
 2  estate has.                                                    2  here should be a simple you can go file these claims and
 3          THE COURT:  And what if I were to enter an order       3  nobody's going to accuse you.  Or this Court is not going to
 4  that didn't dispose of that issue?                             4  hold you as having violated the stay for doing so.  To me,
 5          MR. SIEGER:  I don't know how to respond to that,      5  that is the absolute end of the analysis.  If, in fact, this
 6  Judge.  You're -- I would lump it for lack of a better word.   6  really is a simple procedural motion, there doesn't need to
 7  You're the Judge.  I guess it would depend on what sort of     7  be anymore tricks in language and stuff that they can waive
 8  order you were intending to craft.                             8  in front of a State Court Judge.  We should have a fair shot
 9          THE COURT:  Well, I'll probably give the parties       9  to raise all of these defenses.
10  a first crack at it.                                          10          And I would actually ask that, Your Honor, if you
11  (Laughter)                                                    11  are going to grant this motion, would include a specific
12          MR. SIEGER:  But I would suggest that to the          12  finding, expressed finding or an expressed ruling that the
13  extent you're inclined to grant this motion on some level, I  13  issues that we've raised in our objection, including 546
14  would suggest number one, that it should only be applicable   14  standing and preemption are all preserved for each of the
15  as to the movants, not to creditors as a whole.  And by the   15  State Courts to weigh in on.  I have a concern that any
16  way, in response to one of the issues in the reply, I did     16  order from this Court is going to viewed by a State Court
17  not -- we did not mean when we made that comment to suggest   17  Judge in the absence of some expressed language to the
18  that to the extent any of the movants is a trustee for other  18  contrary, as you somehow having passed on the validity of
19  creditors, that they're prohibited from bringing that claim.  19  these claims or the standing issue.  If, in fact, they're
20  That's not the point.  We just don't think it's appropriate   20  not asking you to do that, we should make it very clear in
21  for a bunch of creditors unrelated to these movants to be     21  the order.  Thank you, Judge.
22  able to bring claims on a motion that they did not bring or   22          THE COURT:  Thank you.  Does anyone else wish to
23  support.                                                      23  be heard?
24          Number two, we don't think there should be any        24          MR. BRADFORD:  Yes, Your Honor.  David Bradford
25  finding at all, Judge about these claims reverting or them    25  on behalf of EGI-TRB.

73

1    Your Honor, I'd like to address both the scope of
2    the motion as it relates EGI-TRB, as well, as the merits of
3    the motion.  This motion sought relief with respect to the
4    recovery of what I referred to as shareholder redemption
5    payments.  EGI-TRB, unlike anyone else before the Court on
6    this motion, received no cash.  It received no payments.
7    And it did not believe it was within the scope of this
8    motion as the motion was filed.  There was a footnote
9    dropped in the reply brief that was submitted by the
10   creditors' committee indicating that while Mr. Zell was not
11   a defendant in this case because, in fact, he received no
12   cash and there's no dispute about that, that EGI-TRB was
13   mistaken in its believe that it was outside the scope of
14   this motion and that it was deemed to be a Step 2 selling
15   shareholder.
16        The basis for that contention illustrates the
17   problem with the merits of this motion.  And that is -- and
18   this part of the transaction I think is undisputed, EGI-TRB
19   as part of Step 1 was obligated to purchase $50 million or
20   Tribune stock.  It was obligated to redeem that stock as
21   part of Step 2, but in the form of a credit towards the
22   purchase of its Step 2 note.
23        So EGI-TRB never got back its $50 million.  What
24   it got was a credit toward a larger investment that it was
25   obligated to make in Step 2.  And what it then received in

74

1    consideration for that stock was part of the funding of a
2    note which is part of a claim before this Court.   There is
3    an effort in the pending complaint to avoid that note.  To
4    now permit State Court litigation which would seek to avoid
5    the very note that is the subject of avoidance efforts
6    before this Court, illustrates precisely why no Court has
7    previously permitted the pursuit of State Court litigation
8    to essentially avoid the very transaction that is the
9    subject of avoidance complaints still pending before the
10   Bankruptcy Court.
11        We think the resolution of our predicament is
12   easier than the larger questions raised by this motion and
13   that Your Honor should make clear that whatever claims are
14   permitted here, they should not include efforts to avoid the
15   EGI-TRB second step note as long as claims are still pending
16   with respect to the avoidance of that note before this
17   Court.  And in particular, I would note that the issues of
18   timing are not compelling as they relate to our circumstance
19   because the only contention as it pertains to EGI-TRB or
20   relates Step 2.  So any limitation issue would not become a
21   concern until December.  There is no Step 1 issue here that
22   would compel an immediate filing of any kind of complaint.
23        We also note, that unlike the suggestion that
24   there may be a release of competing Step 1 claims, there is
25   no suggestion that the Step 2 claims that would compete for

75

1    the same recovery are going to be released.  So we are
2    clearly going to be in a situation where the very same note
3    is the subject of avoidance actions not only before this
4    Court in connection with the consignments complaint, but
5    potentially before four or five other State Courts.  And
6    that again, is foreign territory where no Bankruptcy Court
7    has permitted creditors to go.  And it would be particularly
8    unreasonable and unfair in this context as it pertains to
9    the suggestion that this issue be deferred.
10        We do have confirmation objections to this very
11   aspect of the plans.  We have objections that relate to the
12   546(e) issue.  There's no reason for this Court to prejudge
13   those objections by deciding this issue now as it pertains
14   again solely to EGI-TRB because again, the issue only
15   becomes a problem for the creditors if ever as the December
16   date approaches.  And hopefully, we'll be in a position of
17   resolving these issues in the context of confirmation prior
18   to the time that we get to a limitation issue as to the Step
19   2 obligations.
20        So for that reason, we would ask the Court that
21   however you resolve the larger motion, that you make clear
22   that the unique circumstances raised by the double recovery
23   efforts against the EGI-TRB note and the $50 million of
24   stock that was credited toward the purchase of that note,
25   again not involving any cash, are not the subject of that

76

1    lifting of the stay or of that authorization.
2         I'm happy to answer any questions that the Court
3    may have.
4         THE COURT:  Well, I'll hear what the movants have
5    to say at the end in response to your particular objection,
6    but I guess the only initial thought that occurs to me is
7    what if, in connection with the trial and disposition of a
8    constructive fraudulent conveyance claim in a State Court, a
9    State Court decides that the transaction should be
10   collapsed?  Does that have any implication on your argument
11   that nobody has to worry about an expiring statute until
12   December, with respect to your claim?
13        MR. BRADFORD:  No, Your Honor, because there was
14   no consideration paid to EGI-TRB in connection with step
15   one.  So in other words, all of the claims against a step-
16   one shareholder is -- are shareholders who received cash in
17   exchange for their Tribune stock in connection with step
18   one.  EGI-TRB did nothing but put money into Tribune in
19   connection with step one.  So to review the history, at step
20   one, EGI-TRB pays Tribune $200 million for a note; it pays
21   Tribune $50 million for stock.  That's the end of it.  It
22   gets nothing back.  So if step one is avoided, there is
23   nothing to recover from EGI-TRB as it pertains to step one.
24   The only issue is whether EGI-TRB is entitled to some
25   recovery on account of the obligations owed to it by Tribune

77

78

```
 1  as it pertains to those transactions.
 2          At step two, EGI-TRB is obligated to put in
 3  approximately an incremental $90 million to its investment,
 4  and that new investment takes the form of a $225 million
 5  note and a $90 million warrant.  Rather than put entirely an
 6  additional $315 million of additional cash in, the prior
 7  investment of 225 is credited toward the increased
 8  investment.  So again, no cash comes back.  But all of that
 9  happens in December.  So to the extent that somebody could
10  argue constructively that somehow this credit toward a
11  larger investment is somehow avoidable, that does not occur
12  until December.  And whether the transactions are collapsed
13  or not, there would be no claims pertaining to transactions
14  occurring in April or June, because again, EGI-TRB did not
15  receive anything of value in connection with the first step
16  of this transaction.  It only lost money insofar as the
17  first step of the transaction goes.
18          I would also just note, on the issue of standing,
19  that EGI-TRB contends that it has prior over any
20  distribution to the PHONES as a matter of subordination and
21  priority and therefore does have an interest in the
22  disposition of the estate proceeds in its capacity as a
23  claimant against the estate.
24          THE COURT:  Thank you.
25          MR. BRADFORD:  Thank you, Your Honor.
```

```
 1          THE COURT:  Does anyone else wish to be heard?
 2          MR. DOUGHERTY:  Good morning, Your Honor.  My
 3  name's George Dougherty.  I'm here on behalf of certain
 4  defendants.  We filed a joinder in the objection, and I just
 5  want to make sure that we're here and we agree with what Mr.
 6  Seiger [ph] said, especially the part about the UCC and the
 7  state dismissing the intentional fraudulent conveyance
 8  claims.  We'd love to have that happen.  I don't think it
 9  will.
10          THE COURT:  Mr. Dougherty, who do you represent?
11          MR. DOUGHERTY:  We represent certain defendants:
12  Mr. Fitzsimmons [ph], Mr. Vanesco [ph], et cetera.
13          The other thing is, I do want to make clear that
14  the first two paragraphs in the proposal -- or that WESAU
15  [ph] yesterday, are inconsistent with the idea that they
16  just want to get these claims on file and that the new Court
17  should decide issues of standing.  Paragraphs one and two,
18  in particular, say that the claims no longer constitute
19  property of the estate.  And paragraph one says that the
20  creditors have regained their right to bring these claims.
21  We would object to those.  If there's a new order floating
22  around, I'd like to see it, to the extent you're
23  contemplating entering such an order.  Thank you.
24          THE COURT:  Thank you.
25          MR. TEITELBAUM:  Good morning, Your Honor.  Jay
```

79

80

```
 1  Teitelbaum with Teitelbaum and Baskin for the TM retirees.
 2  We filed a joinder to the objection, Your Honor.
 3          Your Honor, while this has been characterized as
 4  mundane, there are implications and ripples that affect not
 5  only what is -- has happened in the case but what may happen
 6  in the case.
 7          We are in a somewhat unique position in that,
 8  back in April, as Your Honor may recall, the TM retirees
 9  entered into a settlement agreement.  That settlement
10  agreement was appended to the plan, the original plan, and
11  now the amended plan.  And essentially, what that settlement
12  agreement did was compromised and settled not only the
13  amount of the claims but set forth the methodology for
14  calculating.  And as part of that settlement, it provided
15  for releases in connection with LBO litigation.  The fact of
16  the matter is, Your Honor, the -- at that time, these
17  constructive fraud claims, and even at the time of the
18  amended plan, were property of the estate.  And it was, I
19  believe, within the contemplation of the parties that the
20  consequences of the -- of what we're here today, were not
21  even considered.
22          You know, I actually have the opportunity, now
23  that my daughter's taking business law in college, to go
24  over contracts 101.  There was no meeting of the minds at
25  this point, because no one really thought it through.  No
```

```
 1  one realized what could happen in the context of what
 2  happens if these claims get brought, talking not so much
 3  double-recovery, because that's just not within the cards,
 4  and I think we know that, but what are the implications to
 5  the people who are being affected, and particularly my
 6  clients and other similarly situated retirees?  We represent
 7  about 200 of the 450.
 8          The concept here was taking up to a 65-cent
 9  haircut for peace in the valley, if you will.  And now, we
10  have to go back -- and they voted on a plan in that context.
11  If they are now being told: Guess what; you may be compelled
12  to defend -- putting aside merits, et cetera -- serious
13  litigation that could claw back up to 50 percent of that
14  which you may be given in the plan, that's not the deal they
15  bargained for.  That's not the deal they voted for.  And
16  what I'm up here to suggest that the unintended, or perhaps
17  the intended, consequences of this motion is to throw this
18  process into a bit more chaos than this Court has seen to
19  date.
20          THE COURT:  And who would've thought that were
21  possible?
22  (Laughter)
23          MR. TEITELBAUM:  Yes.  The fact of the matter is
24  that the exigency of that chaos outweighs the exigency of
25  June 4.  And what I would ask the Court is to give parties
```

81

```
 1  who hadn't beforehand thought about what the implications
 2  may be to people who voted on a plan and may now have to be
 3  forced to come back to this Court and ask the Court: Wait a
 4  second; we need to rethink this.
 5              I'm not suggesting I have a better mousetrap or a
 6  way to fix it, but I think we need time to see if we can
 7  build that mousetrap, come up with a resolution that works
 8  for everyone, whether it's reasonability, rational
 9  thresholds for pursuing claims, whether it's just carving
10  out certain parties.  But the fact of the matter is, Your
11  Honor, there are implications here.  The PHONES stood up and
12  raised the issue of the subordination.  That's directly
13  implicated in connection with the plan.  That's an issue
14  here that would have to be fought on multiple fronts if, as,
15  and when these State Court actions were to proceed.
16              And speaking only for my clients, some of whom,
17  arguably, are more sympathetic than others in their relative
18  wealth, this is a tremendous burden for individuals.  And
19  you know, now, as a practitioner in a small firm as opposed
20  to a big firm, I see that implication to people, and I see
21  -- and I hear it on the other end when a trustee or a trust
22  says, well, you know, settle it if you don't want to incur
23  the litigation costs.  Well, that's real money to real
24  people who are -- have long since retired in this case from
25  this company, after giving 20/30-plus years and are now not
```

82

```
 1  only faced with not having received pension benefits since
 2  the filing of the case, and looking at 65 percent of their
 3  retirement savings gone, faced with litigating the issue of
 4  do I have to give back -- even if it's a million dollars and
 5  you were 60 years old and that was your retirement.  How
 6  would we deal with that, as individuals in today's world, or
 7  in any world?  That's the reality of what this is.  This
 8  isn't some law school exam; this is reality for people.  And
 9  all I'm asking this Court for is the opportunity to sit down
10  with, hopefully, rational people and come up with a way to
11  say, you know, maybe individuals aren't the same as a
12  billion-dollar trust or other entities.  Maybe they are the
13  same, but we need to discuss it, because I don't think
14  people thought this through.
15              And so, Your Honor, I'm here to ask that the
16  Court not issue this ruling expeditiously in order to give
17  the parties an opportunity, as you have in the past, to try
18  to work through their differences.  And we've achieved
19  differing degrees -- varying degrees of success in that
20  effort, but there has been some success.  Thank you, Your
21  Honor.
22              THE COURT:  Thank you.  Excuse me.
23              MR. JACOBS:  Good morning, Your Honor.  I think
24  there's going to be two brief replies to some of the points
25  that have been made.  David Rosner, Kasowitz, Benson, Torres
```

83

```
 1  & Friedman on behalf of Law Debenture Company of New York.
 2  We're the indenture trustee for approximately 18 percent of
 3  the senior notes, which is roughly $200/$240 million in
 4  senior notes.  We're a co-movant under this motion, and
 5  we're also a co-plan proponent, as your Court has -- as Your
 6  Honor is probably aware.
 7              I'm just going to respond to a couple of the
 8  points.  Again, I think it is -- it's crystal clear that
 9  nobody disputes who owns these claims at this point, and
10  nobody disputes -- well, nobody disputes that the claims of
11  constructive fraudulent conveyance is a different claim from
12  a fraudulent -- from an intentional fraudulent conveyance.
13  There is a dispute as to whether the overlap has some
14  bearing on whether Your Honor is going to allow these claims
15  to go forward or whether a statute of limitations -- an
16  actual defense -- is going to be created here today.
17              The foundations raise this issue of the ordering
18  of the prosecution before Your Honor as if that's an issue
19  that the Court need be concerned about between the estate
20  and between the creditors bringing state law claims.  I will
21  tell Your Honor that is certainly not an issue for today as
22  to how claims are prosecuted and the order in which they are
23  prosecuted.  Number one, that's a defense.  That would be a
24  defense, in any action.  That's a motion that any -- that
25  either Court would consider, based upon proceedings in
```

84

```
 1  another Court, should that Court decide to stay in action,
 2  should that Court decide to dismiss an action without
 3  prejudice pending a determination of another Court.  And
 4  I've seen those types of motions and litigated those types
 5  of motions.  But again, that's a defense.  And the motion
 6  said -- says it in a number of ways, and the movants have
 7  said it in a number of ways, that the point is not to
 8  prejudice any defense.  And so, to the extent that a
 9  defendant wants to say, well, we'd like to see what happens
10  in this Court before this Court, then at least the Court
11  that has proper jurisdiction over the case would be the
12  Court that would be making that determination as to whether
13  ordering had anything to do.
14              But nevertheless, again, we do not seek to
15  prosecute these claims today.  We only seek not to hand an
16  actual $8.2 billion state-statute-of-limitations defense to
17  the defendants, which is why they're here today, because
18  they would like that defense.
19              This issue that there is a transaction that is at
20  issue in competing cases, let's say competing causes of
21  action in competing cases, that issue arises in almost every
22  single case in which there are estate trusts and creditor
23  trusts in which either the creditors have decided to convey
24  their claims to a trust, as what is proposed, or as to
25  whether creditors bring their own claims.  But the idea that
```

85

1  there is a similar transaction being attacked, it's
2  happening in Lyondell right now, even as we speak, involving
3  shareholder claims.  It's happened in Revco in ten different
4  courts.  It's happening in Le Nature's, a case that I'm --
5  that's a case that I'm prosecuting where we've got
6  individual creditors prosecuting their claims.  We're
7  prosecuting the estate causes of action based upon the very
8  same transactions, the very same Ponzi scheme in that case.
9  There's no difference than a direct and a derivative
10 situation.  This happens hundreds, if not thousands, of
11 times.  The transaction at issue, different claims,
12 different plaintiffs, different forms of relief.  So I don't
13 really think that's an issue.
14         And it's certainly fine to hear, from a defendant
15 standpoint, that there's no rush and let's not hear this
16 today and why put the plaintiffs in a position where they
17 can actually preserve their statute of limitations.  We're
18 one of the parties that may ultimately be bringing that, you
19 know, assuming correct direction and indemnity, that we will
20 be bringing that cause of action, we do not think it's
21 appropriate for plaintiffs who have a cause of action to be
22 given a hurdle and to stress a looming $8.2 billion loss,
23 simply due to the passage of time.  A lot can happen.  Your
24 Honor's comments were taken into account at the conclusion
25 of the trial by the other day by a lot of people.  A lot can

86

1  take place between now and when the Court ultimately
2  determines or is called upon to ultimately determine.  But
3  nobody should be sitting and staring at a clock this far
4  into a statute of limitations when the risk is a loss of
5  $8.2 billion worth of claims.  There's no basis for it.  And
6  by the way, if it turns out that any objections upheld, and
7  if it turns out that a defendant, who's sitting here today,
8  there is no claim against them anymore, that, too, is a
9  defense that could be brought.  First of all, they most
10 likely wouldn't be sued; they would be dropped from the
11 complaint.  But let's say that that didn't even happen,
12 because there was some dispute as to whether they would be
13 released.  The release would be put at issue in the proper
14 Court, and that Court would determine the release as a
15 defense.
16         The idea that these claims are reverting to the
17 creditors is a nice terminology that people use, but I
18 think, as we all know, and I don't think anybody would
19 dispute, the claims don't revert to creditors.  They never
20 left the creditors.  The claims were never divested of
21 creditors, and they were never transferred to the estate.
22 All that happened was that, for two years, they couldn't
23 bring the claims.  Now, two years later, they can bring the
24 claims, because the estate no longer has any interest in it;
25 the estate's business with these claims is done.  There's no

87

1  basis to hold back the plaintiffs from bringing them.
2         The retirees, at the very end -- this is the last
3  point I'll make, and I'll hand this over to the committee.
4  That -- I didn't understand, really, the retirees' argument,
5  other than to say that they did not want to get sued.  And I
6  know nobody ever wants to get sued, but there can be no
7  point of there's a surprise here that the plans provide for
8  shareholder litigation to go forward and anybody that
9  received a payment, pursuant to the LBO, is a potential, if
10 not an actual, defendant and will be sued.  That's always
11 existed in these plans.  It's always existed in both plans.
12 It's always been before the Court, and it was certainly out
13 there when people voted.
14         So, Mr. Teitelbaum said that they didn't really
15 think about it that way, and that's not a concern for the
16 Court or for the plaintiffs as to how they decided to think
17 about it.  If it's a voting issue, they could change their
18 vote, but under no circumstances can they carve themselves
19 out as potential defendants if they actually end up getting
20 sued on the basis of the shareholder claims that are being
21 preserved.  Thank you, Your Honor.
22         THE COURT:  Thank you.
23         MR. SOTTILE:  Your Honor, James Sottile of
24 Zuckerman Spaeder, special counsel to the official committee
25 of unsecured creditors.

88

1         I rise, rather than Mr. LeMay solely to address a
2  factual point relating to EGI-TRB's arguments that it should
3  be treated different from all of the other shareholders and
4  that claims, if the Court grants relief in order to assert
5  state law -- constructive fraudulent conveyance claims, it
6  should not grant that relief as to EGI-TRB.
7         Your Honor, quite simply, there's no basis for
8  treating EGI-TRB any differently from any other shareholder
9  that received value in return for its shares.  While you
10 heard a very complex set of transactions described to you by
11 Mr. Bradford, the bottom line is this: EGI-TRB had $50
12 million worth of stock.  That stock was redeemed at step two
13 of the transaction.  It's true it wasn't redeemed in cash,
14 but that's not a requisite for a constructive fraudulent
15 conveyance claim.  Instead of getting cash, as Mr. Bradford
16 said, EGI-TRB got a $50 million credit against its
17 obligation to purchase a note.  If it hadn't gotten that
18 credit, if the shares hadn't been redeemed, it would've had
19 to pay $50 million in cash.  There's simply no basis for
20 treating a $50 million credit against an obligation to buy a
21 note any different from getting $50 million in cash.  And
22 the fore, Your Honor, we submit that if the Court grants the
23 relief requested, which the committee supports and believes
24 you should grant, there's no basis for treating EGI-TRB any
25 differently from any other party.

89

1    Now, you also heard an argument from Mr. Bradford
2 that perhaps the timing supported a different result from --
3 with respect to EGI-TRB, that because their shares were
4 redeemed at step two, there's no great rush, and you could
5 hold off.
6    Your Honor, I believe that Mr. Bradford's
7 analysis of the limitations issue is correct: that the
8 limitations, with respect to that redemption, properly
9 construed, wouldn't run before December.  However, you did
10 hear a very complex set of transactions described to you,
11 described as integrated, starting at step one, continuing
12 through step two, with respect to redemption of shares.  And
13 I don't believe that parties pursing these claims should
14 face the risk that someone later on will argue that all of
15 these transactions should somehow be collapsed together and
16 really the limitations period expired when the initial set
17 of transactions that EGI-TRB engaged in were set in motion.
18 So Your Honor, for that reason as well, we don't believe
19 there's any basis for treating EGI-TRB any differently from
20 any other shareholder, whose shares were redeemed for value,
21 as was clearly the case for EGI-TRB.  Thank you, Your Honor.
22    THE COURT:  Thank you.
23    UNKNOWN:  Your Honor, with -- oh, I'm sorry.
24    MR. GOLDEN:  Your Honor, we did circulate, last
25 night, and we thought we had gotten it to everybody who had

90

1 filed an objection or a joinder, a blackline form of a
2 revised order.  If you -- Your Honor, I'd like to hand that
3 up for one minute.
4    THE COURT:  If you would.
5    MR. GOLDEN:  And if anybody in the courtroom
6 needs one, Mr. Dublin can give it to you.
7    THE COURT:  Thank you.
8    MR. GOLDEN:  Your Honor, I'd just like to point
9 out a couple of points.  I'm going to be very brief.  You've
10 heard foundation's counsel suggest that paragraphs two and
11 three of the proposed form of order are not appropriate.
12 Paragraph two says:
13 "Pursuant to Bankruptcy Code Section 546(a), creditors have
14 regained the right to prosecute their respective creditors
15 SLCFC claims against step-one shareholders and step-two
16 shareholders."
17    I think that Mr. Rosner's explanation of the case
18 law is exactly on point.  Those claims never went away from
19 the creditors.  They've never been ceded to the estate.
20 They were held in abeyance during the pendency of the two
21 years -- first two years of the bankruptcy case, and once
22 that two years had expired and no cause of action had been
23 brought, the creditors were -- retained the right to
24 prosecute the claims.  I don't think anybody actually
25 disputes that.  That doesn't necessarily go to the point

91

1 that the foundations made, that because of a parallel
2 pending intentional fraudulent conveyance action, those
3 claims should -- the state law claims should not proceed.
4 That's a point that he's going to -- if we get an order,
5 he'll be able to argue to the trial court.  So I don't think
6 there's anything about the words in paragraph two that are
7 going to prejudice the foundation.
8    So too, in paragraph three, the right to
9 prosecute a creditors SLCFC claim no longer constitutes
10 property of the debtor's estate.  I don't think anybody
11 actually disputes that.  And --
12    THE COURT:  I might.  And I'll tell you why.
13    MR. GOLDEN:  Okay.
14    THE COURT:  There's a 3rd Circuit case out there
15 that arose in the 363 context, and I think the specific
16 dispute, and I forget the name of the case, centered around
17 whether these rights were transferred as part of a 363 sale.
18 The Court found they're not property of the estate, at least
19 for that purpose.  They're rights that can be asserted by
20 the estate, but I don't -- I think what the Court was
21 saying, they're not 541 rights.  Now, the effect may be the
22 same, but I -- and I'll give you some thoughts when we're
23 done, but --
24    MR. GOLDEN:  Okay.
25    THE COURT:  -- I have that concern.

92

1    MR. GOLDEN:  Okay.  And Your Honor, the only
2 other point I want to point out, which I think should
3 relieve some of the concerns by the foundations counsel, is
4 paragraph eight, where we say nothing in this order shall
5 prejudice or impair any claims or defenses of any defendant
6 in any proceeding in respect of a creditors SLCFC claim.  We
7 were not trying, by virtue of this order, to get a leg up at
8 the trial Court.  They are going to -- the foundations and
9 any other defendant is going to defendant is going to have
10 every right to assert whatever defenses they have at the
11 trial Court level, and it -- and there will be nothing about
12 this order that's going to stop them from doing that.
13    I was -- I think Mr. Sottile gave a wonderful
14 explanation of the EGI-TRB Zell position of the movants and
15 the committee.  Mr. Bradford is a very talented lawyer.  He
16 has appeared in front of you countless times with one goal
17 and one goal only: to make sure that his clients do not end
18 up on the wrong side of a V in a Tribune-related lawsuit.
19 But I don't think it's appropriate for potential defendants
20 to be able to dictate to the plaintiffs, to the estates, and
21 to the creditors who possess these claims, when these claims
22 can be brought, when they should be brought, and any
23 limitations on bringing them.  Because if that was the case,
24 every defendant would have a field day in trying to dictate
25 the contours of a potential litigation.

93

1           And finally, with respect to the retirees, I will
2  have to reiterate.  I don't know what was in the mind of the
3  retirees when they cut their settlement with the DCL plan
4  proponents, but what I find hard to understand or appreciate
5  is that the DCL plan always contemplated -- always
6  contemplated -- the ability of creditors to prosecute,
7  either individually or through a trust into which they would
8  put their claims, state law constructive fraudulent
9  conveyance claims.  Now, the DCL plan, I think as Your Honor
10 may recall, does have a limitation that the first $100,000
11 is protected.  But I'm just surprised that Mr. Teitelbaum
12 said that they -- he and his clients -- were unaware of the
13 fact that, once they cut their settlement, there may be a
14 possibility that some of his clients -- actually, he hasn't
15 said who -- but some of his clients may be defendants in
16 these creditor-sponsored state law constructive fraudulent
17 conveyance claims, because the DCL plan always contemplated
18 that possibility.
19           Excuse me, Your Honor.  That's all I have.
20           THE COURT:  All right.  Thank you.
21           MR. BRADFORD:  Yes, Your Honor.  Very briefly, on
22 EGI-TRB, first, to the extent there's any concern about step
23 one, we're prepared to enter into a tolling agreement to
24 address that.  Clearly, this is a step-two issue only.
25           THE COURT:  I know.  That proposal didn't work

94

1  before.
2           MR. BRADFORD:  It should work here.  Let me just
3  try to be practical about the whole set of EGI-TRB issues,
4  so that we don't have to be ever-present in these
5  proceedings and we can simply.
6           THE COURT:  Oh, I suspect you're going to be here
7  anyway.
8           MR. BRADFORD:  Well --
9  (Laughter)
10          MR. BRADFORD:  -- it's certainly not our desire,
11 Your Honor.  EGI-TRB has no assets, other than its claims
12 against this estate.  Nobody would stand to defend these
13 claims on behalf of EGI-TRB if, upon confirmation and upon
14 motion practice related to that confirmation, we had some
15 clarification as to what, first of all, the rights of EGI-
16 TRB are in connection with this plan.  But more basically --
17 and something we do intend to bring before the Court.  Most
18 recently, there was, added to a complaint, and this was the
19 subject of some of the standing litigation that we tried to
20 pursue and that was ultimately withdrawn, an allegation that
21 EGI-TRB's corporate status should be pierced and that Mr.
22 Zell should somehow be liable personally for that.  There's
23 no factual allegation for that.  It does not comply with
24 Rule 11.  It is something that we think the Court will
25 strike.  And if stricken, we could be done here.  There is

95

1  no reason for us to have to stand and defend all of this,
2  because again, the only assets are the notes that we
3  referred to previously, which are claims against the estate.
4           And so, I think that there is practical value in
5  deferring further litigation until the plan confirmation
6  issues are resolved.  And insofar as this is really a step-
7  two set of issues in any event, we don't think there's a
8  hurry, and we're prepared to give whatever comfort people
9  need to make sure that there's not a preclusive outcome to
10 being able to have that further dialogue.
11          So thank you, Your Honor.
12          THE COURT:  Thank you.
13          MR. LeMAY:  Your Honor, I might have just a few
14 sentences?
15          THE COURT:  Certainly.
16          MR. LeMAY:  Just because I wanted to get in,
17 David LeMay for the committee again, and I apologize for
18 tag-teaming with Mr. Sottile.  We have a division of labor.
19          Just two very brief thoughts, Your Honor.
20          First, to the extent the Court were inclined to
21 entertain the idea of not deciding this right now, today,
22 but instead a brief adjournment, the committee, for its
23 part, would have no problem with that.
24          Second, the proposition was raised that if relief
25 is granted from the stay today, it ought only to be in favor

96

1  of the movants, and that, I think, is probably not something
2  we could agree with.  One of the reasons we got involved in
3  this whole motion was to make sure that there was a level
4  playing field for all creditors.  And as is often the case
5  in lift/stay jurisprudence, there is a concern that you
6  don't put one person in a position that others similarly
7  situated can't take advantage of.
8           So I would urge the Court that if relief from the
9  stay is to be granted today, that it be for the benefit of
10 everyone and not just these movants, and that's the way the
11 current form of order that Mr. Golden tendered --
12          THE COURT:  I know, but --
13          MR. LeMAY:  -- reads.
14          THE COURT:  -- let me ask you this.  As a --
15 well, I'll put it in terms of the 30,000-feet view.  As a
16 prudential matter, why would a Court grant relief to parties
17 who are not asking for such relief?
18          MR. LeMAY:  A fair point, Your Honor.  I think it
19 comes back to the way Section 362 works and the way that the
20 section or the subpart of 362 on relief from the stay works,
21 and you'll see that it says that the Court may grant from --
22 relief from the stay, such as by -- and I'm doing this from
23 memory, and I apologize -- conditioning, annulling, or
24 terminating the stay.  I don't think the -- that the
25 application of the automatic stay, with respect to unsecured

97

```
 1  creditors, is one of those things where it's only the people
 2  who ask for it that can be given relief.  You may determine
 3  those are the only people who should be given relief.  I
 4  guess what I'd like to suggest is that you've got the power,
 5  and I would suggest you should, put everybody on the same
 6  footing.
 7          As I say, one of the very reasons we got
 8  ourselves involved, after the motion was filed, was
 9  precisely to make sure that other voices not in the
10  courtroom today were put on the same footing.  And I think
11  -- I do think that the architecture of Section 362 is
12  supportive of that.
13          THE COURT:  Thank you.
14          MR. LeMAY:  Thank you.
15          THE COURT:  All right.  Last word.
16          MR. TEITELBAUM:  Thank you, Your Honor.  Just
17  very quickly, just to address the point.  The stipulation
18  that was attached to both plans that was executed by the
19  retirees in paragraph seven, says that this -- that -- and
20  I'll -- let me just quote it:
21  "The debtors agree that, in consideration of the compromises
22  set forth herein, and upon the occurrence of the condition
23  of the effectiveness hereof, any and all claims of the
24  debtors and their estates"
25          And recall, at the time this was done, these
```

98

```
 1  constructive fraud claims were claims of the estate, and at
 2  the time of the amended plan
 3  "known or unknown, which may exist against any retiree
 4  claimant, with respect to such claimant retiree claim,
 5  including without limitation, any claim for the avoidance
 6  and recovery of any pre-petition payment or transfer made on
 7  account of such retiree claim shall be hereby released and
 8  waived."
 9          The concept of this specific stip was built into
10  the plan in the definition of retiree release claims in
11  11.1.2 and 11.2.  What I'm suggesting to you -- and maybe I
12  misstated it, and maybe I wasn't clear -- wasn't only what
13  was in the retirees' mind.  Your Honor, it was never within
14  the contemplation of the parties.  And I understand this may
15  not be before the Court today, and this is the chaos point I
16  was trying to avoid.  It may well be that it has to be teed
17  up as to whether the implications of what is being asked for
18  today was fully, fairly, adequately disclosed to people when
19  they made their vote.  And I think that circumstances, that
20  have been presented to this Court today, show that there is
21  some, at least basic, disagreement amongst some very, very
22  smart people as to the implications of the words in the
23  disclosure statement and on certain creditors who voted.
24  And that's what I'm suggesting.  I'm not suggesting it's
25  before you.  I'm suggesting I'm trying to avoid having that
```

99

```
 1  be brought before you, so that we can all try to work
 2  through this issue.
 3          THE COURT:  All right.  Thank you.  All right.
 4  Since the circumstance in which, arguably, the movants here
 5  could've just went and done what they wanted to do without
 6  asking the Court, but they didn't, so if I'm to enter an
 7  order, my inclination is to make it sufficiently clear that
 8  I'm not disposing of substantive rights.  I'm not making a
 9  determination of what happens to state law fraudulent
10  conveyance claims upon the expiration of the estate's
11  ability to pursue them, but without standing in the way of
12  such actions.  So let me just, as I look over the various
13  proposed orders, tell you what I would be willing to
14  consider.  I will give counsel a chance to confer and to
15  submit, excuse me, a form of order which would address these
16  issues.  And to the extent the parties cannot agree, then
17  I'll consider competing forms of order.
18          So, not in any particular order, let me just make
19  the following comments.  And I'll work, initially, from the
20  most recently marked-up proposed form of order that Mr.
21  Golden handed me.
22          I would be willing to say something like pursuant
23  to -- well, the failure of the estate to pursue such claims,
24  that creditors have regained the right, if any, to prosecute
25  their respective creditors SLCFC claims.  And I'll stop
```

100

```
 1  there to say that I'd like -- because I know these orders
 2  will come up in state courts, all of the defined terms to be
 3  explained in the body of the order itself so that courts
 4  don't have to look elsewhere to find out what the order
 5  means.
 6          With respect to the -- whether a creditors SLCFC
 7  claim is or was no longer property of the estate, I don't
 8  want to make that declaration, because I'm not sure it ever
 9  was.  but again, I'm willing to sign an order that makes it
10  clear that this Court is not standing in the way of anyone
11  who has a right to prosecute such a claim, and that the
12  estate has -- I don't know what the appropriate word is to
13  describe it -- failed to pursue, forfeited -- however
14  counsel can work that out -- the right to pursue it, here in
15  the bankruptcy court.
16          I think, with respect to the stay issue, I think
17  whatever paragraphs are built into an order -- I don't want
18  to make a declaration that 362 doesn't bar the commencement,
19  but I would be willing to say, to the extent the stay does
20  apply, it's lifted, solely to permit the commencement of
21  such litigation.  But I would like the memorialization,
22  until further order of this Court -- and I'll tell you why
23  in a moment -- that no litigation should be pursued or
24  prosecuted, because I am concerned about whether there would
25  be implications with respect to any decision I might make in
```

101

```
 1  connection with confirmation of a plan, and I want to
 2  reserve, to myself and to the parties who have objected to
 3  confirmation, to make whatever arguments they have to make
 4  without being hampered by an order that I'm entering here.
 5  I don't mean to dispose of any of those rights.
 6          The bridge lenders proposed order was more
 7  specific in terms of reserving rights, specifically in their
 8  proposed paragraph seven, I think you added there eight.
 9  And I think that covers the extent of the relief that's been
10  requested.  And any objections that have been raised, I now
11  overrule, again subject to not impairing anybody's right to
12  assert a confirmation objection.
13          Now, are there any questions?
14  (No audible response)
15          THE COURT:  Shocking.  I haven't been that clear
16  in weeks.
17  (Laughter)
18          THE COURT:  Okay.  What I'll do, for calendar
19  purposes, is continue the hearing on this motion to the
20  April 11 date, which is the resumption of the confirmation
21  hearing, but we'll expect, in the interim, that counsels
22  should be able to confer and submit, hopefully within the
23  next week or so, a proposed form of order, with a disk,
24  please.  Any questions about that?
25          MR. ALBERTO:  Your Honor, no questions.  Thanks
```

102

```
 1  very much.  I don't have any interest in this matter, if I
 2  could be excused.
 3          THE COURT:  Certainly.
 4          MR. ALBERTO:  Thank you.
 5          THE COURT:  Okay.  We'll take just a five-minute
 6  break, and I'll -- we'll finish what's on the agenda.
 7  (Recess at 12:10 p.m. to 12:17 p.m.)
 8          THE CLERK:  All rise.  Please be seated.
 9          THE COURT:  Did you address number 21 on the
10  agenda?
11          MR. KANSA:  Your Honor, Ken Kansa from Sidley
12  Austin.  We did skip over item 21, which was the 44th
13  omnibus objection, inadvertently.  The only matter we had,
14  going forward on that point, was a status conference with
15  respect to the claim of Ms. Carol Walker [ph].  The -- we
16  spoke with Ms. Walker on Friday, and she has agreed to
17  continue to her claim, to the best of our knowledge, or we
18  agreed to continue our objection, and she agreed to our
19  continuance.  So as a result, we are not proposing to go
20  forward with the status conference on that today.  We also
21  had a response, at the end of the day yesterday, from
22  Software AG --
23          THE COURT:  I saw it this morning.
24          MR. KANSA:  And we have agreed to continue the
25  objection with respect to that claim as well.  We will
```

103

```
 1  submit a revised form of order under certification of
 2  counsel.
 3          THE COURT:  Okay.  Thank you.
 4          MR. KANSA:  Thank you, Your Honor.
 5          THE COURT:  Okay.  Let's turn, lastly, to the
 6  debtors' motion concerning advancement of defense costs.
 7  Let me ask first, though.  Is the committee still pressing
 8  its position?
 9          MR. SEIFE:  Good afternoon, Your Honor.  Howard
10  Seife from Chadbourne & Parke for the committee.  Pressing
11  our position on a request for an adjournment or as to the
12  merits?
13          THE COURT:  Yes.
14  (Laughter)
15          MR. SEIFE:  Yes, we are, Your Honor.
16          THE COURT:  Okay.  Okay.  Let me give you my
17  reaction here.  You know, we face these types of issues all
18  the time.  Now, I haven't read the specific policy, but if
19  what the debtor says here is true, not only is there
20  discreet side A coverage, but a provision which says who
21  gets paid first.  And if that's true, unless -- well, I
22  mean, that, 99 percent of the time, answers the question.
23  So putting aside the alleged need for further discovery,
24  because I know the debtor says why that's not necessary,
25  what's different about this situation that I'm missing here?
```

104

```
 1          MR. SEIFE:  Your Honor, the line of cases, which
 2  Your Honor is very familiar of -- familiar with and cited by
 3  the parties, I think what's striking about them, in each
 4  case, the Court had a fairly fixed and specific idea of what
 5  the claims were that were going to be paid.  And if you go
 6  through each of those cases, whether it's -- and from this
 7  district -- Allied Digital, World Health, Downey.  If you
 8  read those opinions, before the Court was a factual showing
 9  of exactly what the claims were that were going to be paid.
10  And I know it's easy to dismiss the motion -- or grant the
11  motion on the basis that the proceeds are not property the
12  estate, and we don't challenge that, as a conceptual matter.
13  But the policies themselves are property of the estate.  And
14  every dollar that goes out to pay defense costs is a dollar
15  taken away from potential recoveries down the road for
16  creditors or --
17          THE COURT:  Okay.  So there's --
18          MR. SEIFE:  -- from Tribune's --
19          THE COURT:  There's a reduction in the overall
20  coverage if there's a side A payment.
21          MR. SEIFE:  Yes.
22          THE COURT:  Okay.  Even so, is there, in fact,
23  the -- you know, a priority-of-payment provision in the
24  policy?
25          MR. SEIFE:  There is a priority-of-payment
```